[No. 2956.  Decided December 8, 1898.]

G. B. DENNIS et al., Appellants, v. NORTHERN PACIFIC RAILWAY COMPANY, Respondent.

REFORMATION OF DEED—MISTAKE—SUBSEQUENT PURCHASER—NOTICE
—LACHES.

Where a contract for the sale of land agreed upon provided for the reservation by the grantor of a right of way, but through a mistake of the grantor's agent in selecting the proper blank form of deed, a conveyance of the land was made free of such reservation, the deed may be corrected in equity on the ground of mutual mistake.

Where a railroad company makes a deed of premises owned by it under a congressional land grant, giving it a right of way 400 feet wide, a portion of which it was using in the operation of its road, but by mutual mistake the deed omitted the reservation, though agreed to by the grantee, a subsequent grantee cannot be regarded as an innocent purchaser, in view of such public statute, and when he resided in the vicinity for nearly

two years and must have had actual notice that the railroad was in possession of the right of way and operating its trains over it, and when it was a matter of general notoriety that the railroad's right of way was not confined to the width of its road-bed, but that its ownership comprised a strip 400 feet wide.

The fact that a grantor does not begin an action against a subsequent grantee immediately upon discovery of a mistake in the deed to the prior grantee does not amount to laches, where such subsequent grantee is chargeable with knowledge of the mistake.

Appeal from Superior Court, Spokane County.—Hon. LEANDER H. PRATHER, Judge. Affirmed.

*Graves, Wolf & Graves,* for appellants.

*William T. Stoll, John M. Bunn,* and *E. C. Macdonald,* for respondent.

The opinion of the court was delivered by

DUNBAR, J.—This is a suit in equity, brought in 1890, by the plaintiffs and appellants, Dennis and Bradley, alleging themselves to be the owners of certain property, to restrain by injunction the Northern Pacific Railroad Company from grading and improving said property. In 1896 the Northern Pacific Railway Company was substituted as a party defendant for the Northern Pacific Railroad Company, the railway company having succeeded to all the rights and liabilities of the railroad company. An epitomized statement of the case is as follows: The Northern Pacific Railroad Company, in 1864, was granted by congress a right of way through the public lands to the extent of two hundred feet in width on each side of the road bed where it should pass through the public domain. It located its road through Washington Territory and over the lands mentioned in plaintiffs' complaint, viz., the south half of the southeast quarter of section 17, township 25 north, of range 43 east, W. M. It afterwards became possessed of the land in question, including the right of

21—20 WASH.

way, a strip four hundred feet wide. In 1881 it con-
tracted to sell said quarter section of land to one Dodge.
By the terms of said written contract it reserved from such
sale a strip of land four hundred feet in width across said
section, and in 1885 it executed a deed to Dodge for this
realty in conformity with the contract, but alleges that by
mistake the reservation of four hundred feet across it was
omitted from the deed. In 1887, Dodge conveyed the land
to the plaintiffs for a consideration of $8,000.. At the time
the deed was made to Dodge, the company had constructed
the road and was operating the same through the lands
aforesaid, and the road was also in operation at the time
of the purchase of the land from Dodge by the appellants,
and is in operation yet. The testimony shows that the
omission was made by the mistake of the scrivener of the
Northern Pacific Railroad Company; that there were two
sets of blanks which were used in making out deeds under
these contracts, one marked "50 A." and the other "50 B.";
that 50 A. was intended for lands which were distant
from the line of the road and did not have any
reservation of right of way incorporated; that the
one marked 50 B. included the right of way reservation,
and through a mistake the 50 A. was used instead
of the 50 B. This mistake was discovered by the railroad
company prior to the sale of the lands by Dodge to the
appellants. The testimony shows that the appellants were
residents of Spokane, and had been residents thereof for a
year and a half or two years; that the land in question is
adjacent to the city of Spokane and that it has been laid
off by the appellants in town lots. The lower court found
that the deed which was made by the railroad company to
Dodge did not express the intention of the parties, and
that it was their intention to incorporate in the deed the
reservation of the four hundred foot strip of land, and
adjudged that the deed should be reformed and the title of

the railroad company quieted, which was the relief asked for by the company.   Substantially all the findings of fact and conclusions of law were excepted to by the appellants.

It is the contention of the appellants, in the first place, that the mistake proven here, if it was a mistake, cannot be corrected by a court of equity, and they quote from Pomeroy's Equity Jurisprudence (Vol. 3, § 1376), where that author says:

" Equity has jurisdiction to reform written instruments in but two well defined cases: 1. Where there is a mutual mistake,—that is, where there has been a meeting of minds, —an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto; and 2. Where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties.   In such cases the instrument may be made to conform to the agreement or transaction entered into according to the intention of the parties."

It is insisted that this case does not fall within either condition.   But it seems to us, from a perusal of the testimony in this case, that it is brought squarely within the first proposition, and that there was a mutual mistake; that the minds of the parties met and agreed upon the purchase of this land with a reservation to the company of the four hundred foot strip.   That that agreement was evidenced by the contract which was introduced in evidence is plain, and it is just as plain that the consummation or final execution of the contract by deed did not express the intention of the parties which had been incorporated into the contract.   A deed, in one sense, may be said to be a unilateral instrument; but the making of the deed on the part of the company and the acceptance of it by Dodge was the final culmination of all prior agreements on the subject; and, if it did not express those prior agreements, then it falls within the same rule as any other contract which

is sought to be reformed. In *Elliott v. Sackett,* 108 U. S. 132 (2 Sup. Ct. 375), where a deed was executed containing an assumption of a debt which was not a part of the agreement, it was held that there was a departure in the deed, by a mutual mistake, from the terms of the actual agreement, and that the deed should be reformed by striking therefrom the words stating that Elliott assumed and agreed to pay the $9,000 debt as a part of the consideration. In that case the court said:

" The actual contract of the parties, as understood by both of them, is shown by the written agreement. Nothing was agreed upon to vary that. Sackett, as he shows by his testimony, knew the difference as to liability which the difference in the language would make, and knew what the language of the written agreement was, and must be held to have understood it to mean what it does mean, and to have known that Elliott understood it in the same sense. So, in the departure from it in the deed, there was a mutual mistake, it not being shown, as set up in the answer of Sackett, that there was an intention, fully and fairly understood by both parties, that in the deed Elliott should assume and agree to pay the incumbrance. Under all the circumstances proved in this case,    .   .   .    Elliott had a right to presume that the deed would conform to the written agreement, and was not guilty of such negligence or laches, in not observing the provisions of the deed, as should preclude him from relief."

In conclusion the court says, after citing *Snell v. Insurance Co.,* 98 U. S. 95:

" Within those principles this is a case where, in the preparation of the deed to Elliott, there was, by mutual mistake, a failure to embody in the deed the actual agreement of the parties as evidenced by the prior written agreement. The meaning of that prior agreement is clear, and nothing occurred between the parties, after it was signed and delivered, to vary its terms, except the mere fact of the delivery of the deed, the terms of which are complained of and sought to be reformed. The deed did not effect

what both the parties intended by the actual contract which they made, and the case is one for the interposition of a court of equity."

The appellants, in their reply brief, undertake to distinguish this case from the case at bar, and, of course, it can be distinguished so far as some of the facts of the case are concerned; but the principles announced by the court, it seems to us, bear directly upon the facts of this case. It is true that in the case at bar the deed was made by the agent of the party who asks for the reformation, and in the case just quoted it was made by the defendant to the action. But it is just as clear in this case as in that, that the meaning of the prior agreement is plain and that nothing occurred after it was signed and delivered, to vary its terms; and it is equally clear that the deed did not effect what both parties intended by the original contract which they made. In the case quoted above, viz., *Snell v. Insurance Co.,* where it was alleged that the policy issued by the insurance company did not correspond with the agreement, and where it was held that such policy should be reformed to correspond with said agreement, the court said:

" We have before us a contract from which, by mistake, material stipulations have been omitted, whereby the true intent and meaning of the parties are not fully or accurately expressed. A definite, concluded agreement as to insurance, which, in point of time, preceded the preparation and delivery of the policy, is established by legal and exact evidence, which removes all doubt as to the understanding of the parties."

It seems to us that the language used in that case might be properly applied to the facts in the case at bar. The contract was explicit as to the reservation of the four hundred foot strip right of way, and the right of a court of equity to correct a mistake of this kind ought not to be doubted. In that case the court quoted approvingly from

*Gillespie v. Moon,* 2 Johns. Ch. 585 (7 Am. Dec. 559), where Chancellor KENT said:

" 'I have looked into most, if not all, of the cases on this branch of equity jurisdiction, and it appears to me to be established, and on great and essential grounds of justice, that relief can be had against any deed or contract in writing, founded in mistake or fraud. The mistake may be shown by parol proof, and the relief granted to the injured party, whether he sets up the mistake affirmatively, by bill, or as a defense.' In the same case he said: 'It appears to be the steady language of the English chancery for the last seventy years and of all the compilers of the doctrines of that court, that a party may be admitted to show, by parol proof, a mistake as well as fraud, in the execution of a deed or other writing.' And such is the settled law of this court."

In *Hunt v. Rousmaniere's Admrs.,* 1 Pet. 1, a case which was before the supreme court of the United States several times, and which has attracted great attention, it was not only held that a mistake of fact could be corrected, but the doctrine was extended in certain cases to mistakes of law, which it is not necessary to discuss here. But the general rule was announced, and the reason for it, in the following language:

" The execution of agreements, fairly and legally entered into, is one of the peculiar branches of equity jurisdiction; and if the instrument which is intended to execute the agreement, be, from any cause, insufficient for that purpose, the agreement remains as much unexecuted as if one of the parties had refused, altogether, to comply with his engagement; and a court of equity will, in the exercise of its acknowledged jurisdiction, afford relief in the one case, as well as in the other, by compelling the delinquent party fully to perform his agreement, according to the terms of it, and to the manifest intention of the parties."

This doctrine is quoted and indorsed in *Walden v. Skinner,* 101 U. S. 577, and in the 15 Am. & Eng. Enc. Law, 673, the general rule is announced as follows:

"A mistake in written instruments, caused by the ignorance, mistake or negligence of the draughtsman, will be corrected in equity. It does not matter whether the draughtsman was the agent of the party seeking the correction or of the other party,"—

and cites, among many other authorities, *Canedy v. Marcy,* 13 Gray, 373. This case answers one contention of the appellants in relation to the blanks which the scrivener used. Chief Justice SHAW, among other things, in delivering the opinion of the court, says:

" It is no answer to say that the scrivener used the words which he intended to use. It is the mistake of the parties to the deeds which we are to inquire into."

In the case at bar the real meritorious inquiry is, not how the scrivener came to make the mistake, but, was the mistake actually made, so that the mutual agreement of the parties was not effected by the deed? In answer to the contention of the appellants that this was not a mutual mistake, we quote the following from § 868 of 2 Pomeroy's Equity Jurisprudence. Referring to mistakes of this kind, the author says:

" It may be common to both parties; it may be induced or procured by the conduct of the plaintiff; or it may be an error of the defendant alone, wholly due to himself. In either case it will be a defense."

See, also, *Simmons Creek Coal Co. v. Doran,* 142 U. S. 417 (12 Sup. Ct. 239). In fact, the law is so well established in favor of the correction of a mistake of the character shown in this case, that it seems to us to be unquestionable, and on page 7 of their reply brief it is conceded by the appellants that the rule established by the respondent's citations, and which is undoubtedly the law, is that, where the minds of the parties have met, but through mistake, no matter whose, the written instrument does not correctly state the agreement which the parties actually made,

then it may be reformed so as to express that which the
parties intended it should express; and it is conceded that
this is the mistake upon which counsel must rely to estab-
lish their case. We accept this construction of the law as
a correct one, and think that in its application to the case
at bar the deed should be reformed. We also note the cita-
tions in appellants' brief to cases from this court, and re-
affirm the doctrine therein announced,—that, before the
terms of a written instrument can be interfered with, the
proof must be clear and convincing. But to our minds
the proof in this case is most clear and convincing that
the deed did not express the real agreement of the parties.
In *Pitcher v. Hennessey,* 48 N. Y. 415, it was decided
that:

"Parties to an agreement may be mistaken as to some
material fact connected therewith, which formed the con-
sideration thereof or inducement thereto, on the one side
or the other; or they may simply make a mistake in re-
ducing their agreement to writing. In the former case,
before the agreement can be reformed, it must be shown
that the mistake is one of fact, and mutual; in the latter
case it may be a mistake of the draftsman, or one party
only, and it may be a mistake of law or of fact."

In *Born v. Schrenkeisen,* 110 N. Y. 55 (17 N. E. 339),
it was held that where there is no mistake as to the terms of
an agreement, but through a mistake of the scrivener, or by
any other inadvertence in reducing it to writing, the instru-
ment does not express the agreement actually made, it may
be reformed by the court. *Menomonee Locomotive Mnfg.
Co. v. Langworthy,* 18 Wis. 444, is a case where a bill of
sale of personal property from plaintiff to defendant was
properly reformed on the ground that, by mistake of the
plaintiff's secretary, who drew the bill, it had been made
to include articles which did not belong to plaintiff, and
which were not, in fact, included in the negotiations and
agreement of sale between the parties.

But it is contended by the appellants that, even conceding the mistake to have been such a mistake as could be corrected by a court of equity as between the parties to the contract, the appellants here are not bound by the rule, for the reason that they are innocent purchasers and that, no matter what the equities may be between the railroad company and Dodge, they having bought without notice, their title should be protected, especially inasmuch as the mistake was caused by the action of the respondents. This, to our minds, is a very much more difficult question than the one we have been discussing, and it must be conceded at the outset that, if the appellants were innocent purchasers, their rights could not be in any way affected by any mistake, however flagrant, which was made in making the contract between the original parties. But it seems to us that the law is well established that, where a party is in possession of land, even where the public records show the title to be in some one else, the purchaser cannot rely entirely upon the record testimony, but he must take notice also of the rights of those who are in possession. The doctrine of constructive notice is itself the work of evolution. Actual possession was at one time considered the best and only notice. Symbolical delivery of land by leaf or twig, also, in certain stages of society, met the requirements of justice. But with changing conditions constructive notice by way of registry became necessary for the interchange of real estate. It has never been held, however, to be an exclusive notice, nor to take the place of actual notice. In the old case of *Le Neve v. Le Neve,* decided in 1747, 2 White & Tudor's Leading Cases in Equity, 26, it was said by Lord Chancellor HARDWICKE:

" That the taking of a legal estate after notice of a prior right, makes a person a *mala fide* purchaser; and not, that he is not a purchaser for a valuable consideration in every other respect. This is a species of fraud and *dolus malus* itself; for he knew the first purchaser had the clear right

of the estate, and after knowing that, he takes away the right of another person by getting the legal estate."

If this be true, then not only Dodge, who assumed to transfer lands to which he had no title to appellants here, but the appellants themselves, would be guilty of *mala fides* in undertaking to set up title to this land, knowing that the equitable title rested in the railroad company. But, on the general proposition of notice by possession, the editor in commenting on that case said:

" It may be laid down as a general rule, that a purchaser with notice of a right of another, is in equity liable, to the same extent, and in the same manner, as the person from whom he made the purchase."

In *Betts v. Letcher,* 1 S. D. 182 (46 N. W. 193), it was held that notice of a prior unrecorded conveyance, or of any title, legal or equitable, to the premises, or knowledge and notice of any facts which would put a prudent person upon inquiry, impeaches the good faith of the subsequent purchaser.

" This doctrine," said the court, "springs from the apparent, not the true, relation that the person in possession bears to the title. It rests upon the theory that actual and visible possession is a fact of such a character and notoriety as cannot properly escape the observation of a subsequent purchaser or incumbrancer, and is in its nature sufficient to put him on inquiry as to the rights of the possessor."

In *Noyes v. Hall,* 97 U. S. 34, it was held that open, visible and exclusive possession of lands by a person, under a contract for a conveyance of them to him, is constructive notice of his title to creditors and subsequent purchasers. The court in that case said:

" Record evidence of a conveyance operates as notice, and so may open possession; the rule being that actual, visible and open possession is equivalent to registry;"

citing *Cabeen v. Breckenridge,* 48 Ill. 91; *Dunlap v. Wil-*

*son,* 32 Ill. 517; *Bradley v. Snyder,* 14 Ill. 263 (58 Am. Dec. 564).

See, also, *Barr v. Gratz' Heirs,* 4 Wheat. 213; *Chicago & E. I. R. R. Co. v. Hay,* 119 Ill. 493 (10 N. E. 29); *Best v. Zutavern,* 53 Neb. 604 (74 N. W. 64); *Bank of Mendocino v. Baker,* 82 Cal. 114 (22 Pac. 1037); *Pitcher v. Hennessey, supra; Whitaker v. Miller,* 83 Ill. 381; *Randall v. Silverthorn,* 4 Pa. St. 173.

As sustaining this doctrine we cite: *Carter v. Ruddy,* 166 U. S. 493 (17 Sup. Ct. 640); *Pell v. McElroy,* 36 Cal. 268.

While it is true that the latter case was a proceeding to enforce a vendor's lien which could not have been enforced in this state, the principles laid down in relation to the force of possession would apply in this case. Also, *Groff v. State Bank,* 50 Minn. 234 (52 N. W. 651, 36 Am. St. Rep. 640); *Kahre v. Rundle,* 38 Neb. 315 (56 N. W. 888); *Illinois Central R. R. Co. v. McCullough,* 59 Ill. 166.

It is insisted by the appellants that the case of *Lessee of Clarke v. Courtney,* 5 Pet. 319, establishes a contrary doctrine. In that case, after discussing the question at length, it was said:

" If a mere trespasser, without any claim or pretense of title, enters into land, and holds the same adversely to the title of the true owner, it is an ouster or disseisin of the latter. But in such case the possession of the trespasser is bounded by his actual occupancy; and consequently the true owner is not disseised, except as to the portion so occupied. But where a person enters into land under a deed or title, his possession is construed to be co-extensive with his deed or title; and although the deed or title may turn out to be defective, or void, yet the true owner will be deemed disseised to the extent of the boundaries of such deed or title."

It is claimed by the appellants that the further qualification, to-wit: "This, however, is subject to some qualifica-

tion. For, if the true owner be at the same time in possession of a part of the land, claiming title to the whole, then his seisin extends by construction of law to all the land, which is not in the actual possession and occupancy, by enclosure or otherwise, of the party so claiming under a defective deed or title," has no application to this case. But it seems to us that the qualification which the court makes in the language just above quoted establishes the law in favor of respondent's contention that its possession was not restricted to the land actually occupied. It is true that there are authorities which take the other view of this proposition, notably *Bloomer v. Henderson,* 8 Mich. 394 (77 Am. Dec. 453), where it was held, in substance, that possession of land by a grantor is no notice of any rights or equities in him to one who acquires an interest in the land on the faith of his recorded conveyance; and it was there said by Judge CHRISTIANCY, who delivered the opinion for the court, after announcing that possession raises a reasonable presumption that the party in possession has some right in the premises, that:

" The object of the law, in holding such possession constructive notice, where it has been so held, is to protect the possessor from the acts of others who do not derive their title from him,—not to protect him against *his own acts,* and especially against his own deed."

But it appeared in that case that the defendant, who was asking for relief, had purchased the mortgage in good faith, and had no actual notice of complainant's possession, and the equities of this case seemed to appeal very strongly to the court in his behalf. The court found that gross fraud was committed by the original parties, and that the plaintiff, by gross carelessness, had put it in the power of the wrongdoers to commit a fraud; that such fraud must result in a loss to either one or the other of the parties litigant; and applied the equitable rule that he should bear

the loss who improvidently enabled the wrongdoer to commit the fraud. But, as we have before indicated, every case must stand or fall upon its own merits, and, after all, the province of the court is to determine the equities between the parties from the testimony presented, and, in this case, considering the fact which we have before alluded to, that the right of the company to this strip of land granted to them by public statute was a fact which must have been known to the appellants in this case, we think that was sufficient to have put them upon inquiry as to who the true owner of the land was. It is true that the appellants in this case both testify that they had no actual knowledge that the railroad was operated through the quarter section which they bought. The lower court, who heard this testimony and saw the witnesses on the stand, evidently did not accredit it, and we think the court was justified in the conclusions reached. It is not reasonable that men who have the capacity to deal in lands and who have the business capacity that these men show themselves to have, both by their letters to the railroad company in relation to this matter which are incorporated in the statement of facts, and by their testimony generally, would act so carelessly in a purchase which involved $8,000, and when that purchase was made confessedly for speculative purposes, taking into consideration, too, the fact that they had from a year to two years been residents of the city of Spokane in the immediate vicinity of this land, as not to have taken notice of a fact which must have been patent to everybody else in that community, viz., that the trains of the Northern Pacific Railroad Company actually ran across this piece of land, and that, if they did so run, they must necessarily have had tracks and road bed to run upon. We have no doubt that they did possess this knowledge; that they knew that the track and road bed were there, and that the road was operated there; and, having that knowledge,

the law imputes to them the further knowledge of the true ownership of the land. It was sufficient, at least, under all the authorities, to have placed them on inquiry, and such inquiry would have resulted in the knowledge that the railroad company was the claimant and owner of the land in question. This being true, then, the appellants cannot set up the claim of innocent purchasers, and, as that is the only claim upon which they can rely, the fact that the company did not at once commence an action to reform the deed is not a laches on the part of the company of which they can complain.

But it is again contended by the appellants that, even conceding the law to be that possession of real estate is notice, such law does not apply to the facts of this case, for the reason that the respondent was in actual possession only of the road bed, or of so much of the four hundred foot strip as was actually occupied by it in operating the road. We do not think that this contention can be sustained. The voice of all authority is that every case must, to a great extent, depend upon the circumstances surrounding that particular case. In this case, by act of congress, a strip of land four hundred feet wide was granted to the Northern Pacific Railroad Company. This was not only a public act, but it was a notorious one. Knowledge of this act must be imputed to every intelligent person in communities where the Northern Pacific railroad is projected. It is a matter universally noticed and talked about. It is a matter of common knowledge that the right of way of railroad companies is not limited to the amount of land actually occupied by their tracks; and it seems to us that purchasers of any portion of the right of way which was granted by public statute were put upon inquiry concerning the equitable title to such land. And we think the authorities fully bear out this view, and establish the duty of the purchaser to inquire in cases where the possession is not

nearly so notorious as it is in cases of this kind.    In
*Mallett v. Kaehler,* 141 Ill. 70 (30 N. E. 549), a case
where a vendee of two adjoining lots under an unrecorded
contract leased them, and a person who lived on a lot ad-
joining the two had a barn extended partly on one of
said two lots, it was held that the tenant's possession of the
two lots by means of his barn and his taking timber and
grass from the lots was sufficient to put a subsequent pur-
chaser on inquiry as to the vendee's rights.    The court, in
deciding the case, said:

" We think there can be no doubt that the occupancy of
lot 4 was such as to put appellants upon inquiry.    What
would that inquiry have led to ?    Certainly not merely
that the tenant of appellee occupied only a part or all of
lot 4, but also that he held possession of lot 3.    That infor-
mation would have made it their duty to pursue the in-
quiry to appellee, and there they would have learned of
his contract with Mrs. Jenkins, not for lot 4 only, but
also for lot 3."

In *Simmons Creek Coal Co. v. Doran, supra,* the court
indorsed the rule in *Burwell's Admrs. v. Fauber,* 21 Grat.
446, that purchasers are bound to use a due degree of
caution in making their purchases, or they will not be en-
titled to protection.    It said:

" *Caveat emptor* is one of the best settled maxims of
law, and applies exclusively to a purchaser.    He must take
care and make due inquiries, or he may not be a *bona fide*
purchaser.    He is bound not only by *actual,* but also by
*constructive* notice, which is the same in its effect as actual
notice.    He must look to the title papers under which he
buys, and is charged with notice of all the facts appearing
upon their face, or to the knowledge of which anything
there appearing will conduct him.    He has no right to
shut his eyes or his ears to the inlet of information, and
then say he is a *bona fide* purchaser without notice."

It was there held that actual and unequivocal adverse
possession of land was notice to a purchaser; that it is

incumbent upon him to ascertain by whom and in what right it is held; and that the unexplained neglect of this duty is equivalent to notice. It was held in *Ellicott v. Pearl,* 10 Pet. 412, that the assumption that there can be no possession to defeat an adverse title, except in one or other of these ways,—that is, by an actual residence, or an actual inclosure,—is a doctrine wholly irreconcilable with principle and authority. *Stines v. Hays,* 36 N. J. Eq. 364, is a case which embodies the same principles, and very much the same state of facts, as is shown by this case. There, in 1871, the complainant and two adjacent land owners agreed in writing with the defendant to convey to him a strip of land for a road, with an exception or reservation to the vendors of a right to use the road. By a mistake of the scrivener, the deed omitted the exception or reservation, and the road was used by the complainant from 1871 to 1881, when the defendant denied his right to use it. The complainant discovered the mistake in his deed in 1879. It will be observed, also, that in this case the action was not brought for two years after the discovery of the mistake. It was held that the deed should be reformed to comply with the intention of the parties.

We think no error was committed by the court in the introduction of testimony. The testimony admitted was necessary for the determination of the facts in issue. Under all the circumstances of this case we are convinced— First, that the deed. was made through a mistake; and second, that the appellants were not innocent purchasers, and that equity ought to interpose to place the parties in the position in which the original agreement placed them.

The judgment will be affirmed.

SCOTT, C. J., and GORDON, ANDERS and REAVIS, JJ., concur.